UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA                                                                         Plaintiff

v.                                                                    Criminal Action No. 3:15-cr-44-RGJ

DARRYLE COOPER                                                                                 Defendant

\* \* \* \* \*

**MEMORANDUM OPINION & ORDER**

Defendant Darryle Cooper's ("Cooper") moves for a new trial. [DE 433]. The United States responded [DE 438] and Cooper replied [DE 444]. Because Cooper's reply raised new arguments pursuant *Brady v. Maryland*, 373 U.S. 83 (1963), the Court ordered additional briefing on the issue. [DE 452]. Cooper [DE 456] and the United States [DE 455] both responded to the Court's Order. Briefing is complete, and the matter is ripe. For the reasons below, Cooper's Motion for a New Trial [DE 433] is **GRANTED**.

## I.  BACKGROUND

The Drug Enforcement Administration ("DEA") began a criminal investigation into the Martin Polk ("Polk") drug trafficking organization in 2015. [DE 433 at 2553]. As part of the investigation, the DEA obtained authority to receive real-time, precise location information for several cellphones. [DE 455 at 2626]. Phone numbers 909-636-6783 and 470-723-9266 were the subject of a Kentucky state warrant on March 30, 2015. [*Id.*]. At the time they sought the warrants, agents believed that the same individual was using both phones. [*Id.*]. This belief was based on Polk's frequent use of the name "Bro Bro" during intercepted calls. [*Id.* at 2626–27].

The DEA soon realized that the phones belonged to two different individuals. [DE 455 at 2627]. When agents obtained the warrant, both phones pinged in Los Angeles, California. [*Id.*].

The next day, the 470 number pinged in Indianapolis, Indiana and traveled to 3116 Commander Avenue, Louisville, Kentucky. [*Id.*]. The 909 number remained in California. [*Id.*]. Although the person associated with the 909 number was never prosecuted, Cooper was the owner of the 470 number. [DE 433 at 2555]. Evidence gathered by law enforcement suggested that Polk, who resided in Los Angeles, was responsible for sending shipments of heroin and cocaine to Ronald Williams ("Williams") in Louisville. [*Id.* at 2553]. Polk's girlfriend, Ebony Burrus ("Burrus"), would lease vehicles and reserve hotel rooms in Louisville for Polk and would collect debts on Polk's narcotics sales. [*Id.*].

Law enforcement also believed that Polk maintained a "stash" location at 3116 Commander Drive and sent people to guard the location on several occasions. [*Id.*]. In January 2015, agents intercepted calls between Polk and an unidentified person named "Bro Bro" who was assisting in Polk's drug trafficking operation. [*Id.* at 2554]. Polk told Bro Bro that he was going to stash his vehicle. [*Id.* at 2555]. Law enforcement observed Polk arriving at 3116 Commander Avenue and parking a Ford Expedition in the detached garage. [*Id.*]. However, agents never intercepted a call between Cooper and Polk. [*Id.*]. Cooper was never identified as Bro Bro, but witnesses did testify that he went by the name "Kong." [DE 395, Trial Tr., Vol. 2, at 2052].

On April 3, 2015, law enforcement executed a search warrant on 3116 Commander Drive. [DE 433 at 2556]. Cooper opened the door for law enforcement and informed officers that he was visiting from California to relax and spend time with his sister. [*Id.*]. Cooper stated that he owned the residence and rented the garage space to a man named "Jerry" who used it to store an older model Ford Expedition. [*Id.*]. This vehicle was suspected of having a hidden compartment and being used in Polk's drug trafficking operation. [*Id.*]. While searching the residence, law enforcement found a safe inside of a closet, which was locked with a deadbolt. [*Id.*]. Inside the

safe, officers found $276,000 in cash and what was believed to be a drug ledger. [*Id.* at 2556–57]. When asked about the contents of the safe, Cooper asserted that it contained his life savings. [*Id.*]. He claimed that he worked in the entertainment industry and earned the money managing music acts at smaller venues by collecting cash at the door. [*Id.* at 2559]. Cooper asserted that he was holding the money to pay off an outstanding tax debt. [*Id.*].

While searching the residence, law enforcement also found a digital money counter, a paper shredder, black duct tape, saran-wrap, and axle grease. [*Id.* at 2557]. Agents found two pistols in the residence. [*Id.*]. Cooper asserted that another individual, Damani Hashim ("Hashim"), would often travel with him to Louisville and stay at the residence. [*Id.*]. The United States conceded that it is likely the second pistol belonged to Hashim. [*Id.*]. A search of the Ford Expedition, which was registered to Burrus, revealed a hidden compartment behind the dash of the vehicle. [*Id.*]. Law enforcement did not find drugs at 3116 Commander Drive. [*Id.*].

Cooper was charged with three counts: (1) conspiracy to possess and distribute heroin, (2) possession with intent to distribute heroin, and (3) possession of a firearm in furtherance of a drug trafficking crime. [DE 256]. At trial, the United States presented evidence that they allege proved Cooper delivered heroine to Williams on April 2, 2015—one day before police searched the residence at 3116 Commander Drive. [DE 455 at 2629]. The evidence consisted of photos from pole cameras of Cooper's rental car leaving 3116 Commander Drive and arriving at Williams' apartment at 4551 S 2nd Street. [DE 455 at 2629]. The photos indicated that Williams briefly interacted with the vehicle before it drove away. [*Id.*]. Williams testified that Cooper delivered the heroin and testimony from Burrus and Polk identified Cooper as a member of the conspiracy. [DE 444 at 2603]. However, the photos from the pole cameras did not show Cooper driving the vehicle or delivering heroin to Williams. [*Id.* at 2603–604]. The United States did not present any

intercepted phone calls implicating Cooper in the drug trafficking activity. [*Id.*]. Cooper claims that another individual borrowed the car during the time in question on April 2, and that he was nowhere near the alleged drug transaction. [DE 433 at 2559].

The jury found Cooper guilty on all three counts, and Cooper was sentenced to 180 months of imprisonment followed by five years of supervised release. [DE 384]. After Cooper's conviction, Cooper filed several motions to compel the Government to turn over evidence, including all location tracking data for the 470 phone number. [DE 344; DE 345; DE 346; DE 350]. The United States voluntarily turned over the information. [DE 362]. The location data included the location of Cooper's phone during the alleged April 2, 2015, delivery of heroin to Williams. [DE 433 at 2563]. At trial, Detective Danny Evans ("Evans") testified that the vehicle 3116 Commander Drive at 1:44 p.m. and arriving at Williams' address 13 minutes later at 1:57 p.m. [DE 395 at 1866–69]. The delivery lasted approximately 16 seconds. [*Id.* at 1870]. The vehicle returned to 3116 Commander Drive at approximately 3:02 p.m. [*Id.* at 1866]. This testimony was based on an analysis of the pole camera footage. [*Id.*].

Despite Evans' testimony, the location data provided post-trial for the same day suggests that Cooper's phone left 3116 Commander Drive at 1:17 p.m. [DE 433 at 2563]. From 1:17 to 1:52 p.m., the phone traveled to 8800 Park Laureate Drive. [*Id.*]. From 1:52 to 2:10 p.m., the phone traveled to 1892 Princeton Drive before returning to 3116 Commander Drive. [*Id.*]. This data indicates that Cooper was 6.5 to 7.5 miles away from Williams' apartment at 4551 S 2nd Street. [*Id.*]. Evans testified that the ping data varied in approximate distance from 2,500 meters to nine meters and pinged every 15 minutes. [DE 395 at 1841].

Prior to trial, Cooper requested that the United States "provide and/or permit the inspection and copying of the Rule 16 discovery and Brady materials." [DE 456 at 2638]. Cooper also

requested "detailed disclosure of the circumstances surrounding the use of any electronic surveillance in association with this case." [*Id.* at 2639]. The United States did not provide Cooper, or any other defendants, with the underlying ping data. [DE 455 at 2628]. But the United States did provide Cooper with a report indicating that his phone was subject to geo-locating. [DE 455-1]. Cooper concedes that he was aware the United States had geo-location data but was unaware that the Government possessed data for the April 2, 2015. [DE 456 at 2641–42]. When asked about the period during which law enforcement was tracking Cooper, Special Agent Brian Sanders ("Sanders") testified that he did not remember the exact dates, but February and March seemed accurate. [DE 395 at 1980].

Sanders also testified that the government had location data for the 909 number on April 2, which Cooper requested at trial. [*Id.* at 2001]. This request was later withdrawn because the United States indicated that the location data was indecipherable because it was in its raw form. [DE 396, Trial Tr., Vol 3, at 2116 ("And they also indicated to me that the ping data they have is raw data. In other words, it's just going to be just sheets of numbers and things that really, unless they're—they would be indiscernible just looking at them in the format that they have them at this point in time.")]. However, in its supplemental brief to this motion, the United States explained that the ping data was not in its raw form and required no deciphering. [DE 455 at 2628]. Instead, the phone companies forwarded ping data by email that was generated every 15 minutes. [*Id.*]. The email contained latitude and longitude along with a radius within which the phone was located. [*Id.*]. The emails also included a link to Google Maps, which would plot the ping on a map. [*Id.*].

Following the post-trial discovery of ping data indicating that Cooper was not present at the April 2 heroin delivery, Cooper moved for a new trial. [DE 433]. After reviewing the parties' briefs, the Court requested additional briefing and included six questions for the parties to answer.

5

[DE 452]. The United States [DE 455] and Cooper [DE 456] both submitted supplemental briefs addressing the Court's questions. Having reviewed the record and the parties' post-trial briefs, the Court will resolve Cooper's Motion for a New Trial [DE 433].

## II. STANDARD

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, [a district] court may vacate any judgment and grant a new trial if the interest of justice so requires." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (quoting Fed. R. Crim. P. 33(a)). Rule 33's "interest of justice" standard allows the grant of a new trial where substantial legal error has occurred. *United States v. Whittle*, 223 F. Supp. 3d 671, 675 (W.D. Ky. 2016), *aff'd,* 713 F. App'x 457 (6th Cir. 2017) (citing *Munoz*, 605 F.3d at 373). The court may grant a new trial on one of two grounds: (1) newly discovered evidence under Rule 33(b)(1); or (2) a motion "grounded on any reason other than newly discovered evidence" under Rule 33(b)(2). *Id.* The burden is on the defendant to justify a new trial. *United States v. Carson*, 560 F.3d 566, 585 (6th Cir. 2009). "The decision to grant or deny a motion for a new trial is entirely within the discretion of the district court, and [the Sixth Circuit] will not reverse absent a showing of an abuse of discretion." *United States v. Anderson*, 76 F.3d 685, 692 (6th Cir. 1996); *see also United States v. Farrad*, 895 F.3d 859, 885 (6th Cir. 2018); *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015). "[S]uch motions should be granted sparingly and with caution." *United States v. Turner*, 995 F.2d 1357, 1364 (6th Cir. 1993); *see also United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007) (Rule 33 motions "are granted only in the extraordinary circumstance where the evidence preponderates heavily against the verdict." (citation and quotation omitted)).

### III. ANALYSIS

Cooper argues that he is entitled to a new trial because the newly discovered ping data from April 2, 2015, was exculpatory and should have been turned over pursuant to *Brady*. [DE 444; DE 456]. In response, The United States contends that the evidence is not exculpatory and does not constitute *Brady* evidence. [DE 455 at 2632]. The United States also contends that Cooper's motion was untimely. [DE 438 at 2582].

### A. *Brady* Violation

"In order to establish a *Brady* claim [Cooper] must show that: (1) evidence was suppressed by the prosecution in that it was not known to [Cooper] and not available from another source; (2) the evidence was favorable or exculpatory; and (3) the evidence was material to the question of [Cooper's] guilt." *United States v. Faller*, No. 1:13CR-00029-JHM, 2014 WL 12691595, at *4 (W.D. Ky. May 29, 2014) (citing *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000); *Luton v. Grandison*, 44 F.3d 626, 628-29 (8th Cir. 1994); *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *Moore v. Illinois*, 409 U.S. 786, 794–95 (1972)). "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Jalowiec v. Bradshaw*, 657 F.3d 293, 305 (6th Cir. 2011) (quoting *Cone v. Bell*, 556 U.S. 449, 469–70 (2009)). If the allegedly suppressed evidence is "merely cumulative to evidence presented at trial, then it is immaterial under *Brady*." *United States v. Bailey*, No. 19-2280, 2022 WL 2444930, at *11 (6th Cir. July 5, 2022) (internal quotation marks and citations omitted). "[T]he government typically is the sole judge of what evidence in its possession is subject do disclosure" under *Brady*. *United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir. 1988) (holding that if the government fails to adequately comply with its *Brady* disclosure duties, "it acts at its own peril").

7

First, the Court specifically asked the parties whether Cooper was aware that the United States had ping data prior to or during trial. [DE 452]. Cooper represents that he was unaware that the United States had geo-location data for April 2, 2015. [DE 456 at 2641–42]. The United States asserts that Cooper was aware because it provided the DEA report [455-1] describing the acquisition of location data and because Cooper's counsel asked multiple witnesses about the location data at trial. [DE 455 at 2631–32]. Although Cooper may have been aware that some ping data existed, neither party has cited to a point in the record indicating that Cooper was aware that the Government had location data for April 2, 2015. When discussing the time period for ping data, Sanders testified that he did not remember the exact dates, but February and March seemed accurate. [DE 395 at 1980]. Moreover, Cooper specifically requested "detailed disclosure of the circumstances surrounding the use of any electronic surveillance in association with this case." [DE 456 at 2639]. Cooper asserts that the United States turned over location data for other occasions, but not for April 2, 2015. [*Id.* at 2642]. Cooper had no reason to believe that the United States had additional location data that may be exculpatory based on his discovery request. [*Id.* at 2639]. The government was undoubtedly in possession of the ping data, and the nondisclosure of this information was an impermissible suppression. *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). The Court finds that Cooper's ping data for April 2, 2015, was suppressed by the United States. *See Faller*, 2014 WL 12691595, at *4. Accordingly, the Court finds that Cooper has satisfied the first element of *Brady*. *Id.*

Next, Cooper claims that the ping data for April 2, 2015, is exculpatory because it proves that he was not present at the heroin delivery on the same day. [DE 444 at 2604]. In response, the United States contends that the ping data was not turned over because it is not exculpatory. [DE 455 at 2632]. The United States argues that the ping data was only helpful in combination with

other evidence or personal observations due to its lack of precision. [*Id.* at 2630]. At trial, the United States' witness testified that the ping data varied in approximate distance but could be as precise as nine meters and pinged every 15 minutes. [DE 395 at 1841]. Given the potential accuracy, it is indisputable that the ping data placing Cooper 6.5 to 7.5 miles away from Williams' apartment on April 2, 2015, at the same time as the heroin delivery is exculpatory. [*Id.*]. Accordingly, the Court finds that Cooper's ping data from April 2, 2015, was exculpatory, which satisfies the second element of *Brady*. *See Faller*, 2014 WL 12691595, at *4.

Finally, Cooper argues that the ping data is material because it proves he was miles away from the heroin delivery. [DE 444 at 2602]. In response, the United States argues that the evidence is merely cumulative. [DE 438 at 2579]. The United States is correct to suggest that the ping data is not material if it is merely cumulative. *See Bailey*, 2022 WL 2444930, at *11. Cooper testified at trial that he was dropping off a friend in the Highlands when the heroin delivery took place. [DE 319, Trial Tr., Cooper Testimony, at 1523]. However, the ping data is the only independent evidence that Cooper was not present for the heroin delivery on August 2, 2015. Therefore, the Court cannot find that the ping data was merely cumulative. *See Bailey*, 2022 WL 2444930, at *11. Instead, the ping data provided an independent basis on which to prove Cooper was elsewhere during the delivery.

The United States argues that even if the ping data was material, a new trial would not be warranted because of the overwhelming evidence against Cooper. [DE 455 at 2632]. "[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles*, 514 U.S. at 434 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

The United States points to testimony from two other defendants describing Cooper's role in the April 2 delivery and the cash found at the residence on Commander Drive. [DE 455 at 2632]. However, this is not a substantial body of evidence. The only evidence placing Cooper at the heroin delivery on April 2, 2015, was the testimony of two other defendants. [*Id.*]. Cooper successfully elicited testimony from his co-defendants impeaching their credibility based on their plea agreements. [DE 395 at 2020–24 (Burrus), 2078–81 (Williams); DE 396 at 2206 (Polk)]. The Sixth Circuit has held that such testimony could suggest bias. *See Farkas v. United States*, 2 F.2d 644, 647 (6th Cir. 1924). Out of the voluminous calls intercepted by law enforcement while investigating this drug trafficking organization, the United States did not produce a single call between Cooper and his co-defendants. [DE 444 at 2605]; *see also United States v. Chavez*, 894 F.3d 593, 600 (4th Cir. 2018) (holding hours of recorded calls and forensic evidence corroborating testimony from eyewitnesses made alleged *Brady* evidence immaterial).

Moreover, Cooper's ping data places him 6.5 to 7.5 miles away from Williams' apartment on April 2, 2015. [DE 395 at 1841]. Without evidence that the ping data was inaccurate, Cooper's ping data could provide incontrovertible proof that Cooper did not partake in the heroin delivery. *See Hung Lam v. City of San Jose*, 869 F.3d 1077, 1085 (9th Cir. 2017) (denying judgment as a matter of law under Rule 50(b) where physical evidence did not provide incontrovertible proof testimony was inaccurate). The United States did not cite to pole camera photos or surveillance video that placing Cooper at the scene of the heroin delivery. [DE 455]. Accordingly, the Court finds that Cooper has satisfied the third and final element of a *Brady* violation regarding his ping data from April 2, 2015. *See Faller*, 2014 WL 12691595, at *4.

Cooper's ping data from April 2, 2015, was material evidence, and the Government suppressed it. Therefore, suppression of the evidence constitutes a *Brady* violation. *See Kyles*,

514 U.S. at 434. Rule 33 allows the Court to vacate any judgment and grant a new trial where a substantial legal error has occurred. *Whittle*, 223 F. Supp. 3d at 675. This decision is entirely within the discretion of the District Court. *Anderson*, 76 F.3d at 692. Nevertheless, Cooper has satisfied his burden to justify a new trial by demonstrating a *Brady* violation. *Carson*, 560 F.3d at 585. The "remedy for a *Brady* violation is a new trial." *United States v. Paulus*, No. 20-6017, 2021 WL 3620445, at *4 (6th Cir. Aug. 16, 2021) (citing cases). Thus, a new trial is required here. *See, e.g.*, *United States v. Romano*, No. 2:19-CR-202, 2023 WL 2552517, at *5 (S.D. Ohio Mar. 17, 2023). For these reasons, Cooper's Motion for a New Trial [DE 433] is **GRANTED**.

### B. Timeliness

The United States suggests that Cooper's Motion for a New Trial is untimely. [DE 438 at 2582]. However, the Court granted two motions for additional time to file Cooper's motion for a new trial. [DE 429; DE 432]. Cooper filed his Motion for a New Trial on December 26, 2021, the final day to file under the last extension. [DE 432]. Accordingly, the Court finds that Cooper's motion was filed on time.

### IV. CONCLUSION

Having thus considered the parties' filings and the applicable law, and being otherwise sufficiently advised, the Court **ORDERS** that:

1. Cooper's Motion for a New Trial [DE 433] is **GRANTED**;

2. The United States Marshals Service is directed to ensure Cooper is delivered from the Bureau of Prisons to the Western District of Kentucky for the purpose of future hearings.

3. An in-person status conference is scheduled for **July 26, 2023 at 10:45 a.m**. before the Honorable Rebecca Grady Jennings, Gene Snyder U.S. Courthouse, Louisville, Kentucky.

Cooper's appearance is waived to the extent the U.S. Marshals Service is unable to deliver him prior to this hearing.

4. The parties shall file status reports no later than seven days before the status conference addressing the following issues:

    a) Additional pre-trial discovery, if any;

    b) Potential dates for the final pretrial conference and new trial;

    c) The length of trial;

    d) Any other issues that the Parties deem appropriate to discuss at the status conference.

Rebecca Grady Jennings, District Judge
United States District Court

June 27, 2023

12