UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA                                                    Plaintiff

v.                                                    Criminal Action No. 3:15-cr-44-RGJ

DARRYLE COOPER                                                              Defendant

* * * * *

**MEMORANDUM OPINION AND ORDER**

The United States filed a motion for this Court to reconsider its memorandum opinion and order [DE 460] granting Defendant, Darryle Cooper ("Cooper"), a new trial. [DE 463]. Cooper responded, and the United States replied. [DE 467; DE 468]. The Court then issued an order setting an evidentiary hearing, [DE 469], which was held on December 1, 2023. [DE 473]. Having considered the parties submissions and conducted the evidentiary hearing, this matter is ripe for adjudication. For the reasons below, the Court **GRANTS** the motion to reconsider. [DE 463].

I.        **Background**

Cooper was convicted on three counts—(1) conspiracy to possess and distribute heroin, (2) possession with intent to distribute heroin, and (3) possession of a firearm in furtherance of a drug trafficking crime—for his activities in connection with a drug trafficking organization. [DE 256; DE 293]. A significant piece of the United States' theory at trial was Cooper's participation in a drug delivery on April 2, 2015, at 1:57 p.m. Eastern Time. After he was convicted, the Court granted a new trial based on cellular location data from Cooper's phone that was not turned over to him before trial. [DE 460 at 2661]. Initially, that ping data appeared to affirmatively place Cooper away from the drug delivery at the time it took place, so the Court found that a *Brady* violation had occurred and ordered a new trial. [*Id.*]. But in its motion for reconsideration, the

1

United States informed the Court for the first time that the data was expressed in Central Time, not Eastern Time, and therefore tells a different story. [DE 463 at 2668]. The Court must now consider whether the ping data and the United States' failure to turn it over to Cooper constituted a *Brady* violation in light of this entirely new narrative.

### A.  The Drug Investigation

The Drug Enforcement Administration ("DEA") began a criminal investigation into Marlin Polk's ("Polk") drug trafficking organization in 2015.  [DE 433 at 2553].  As part of the investigation, the DEA obtained authority to receive real-time, precise location information for several cellphones.  [DE 455 at 2626].  Phone numbers 909-636-6783 and 470-723-9266 were the subject of a Kentucky state warrant on March 30, 2015. [*Id.*].  At the time they sought the warrants, agents believed that the same individual was using both phones.  [*Id.*].  This belief was based on Polk's frequent use of the name "Bro Bro" during intercepted calls.  [*Id.* at 2626–27].

The DEA soon realized that the phones belonged to two different individuals.  [DE 455 at 2627].  When agents obtained the warrant, both phones pinged in Los Angeles, California.  [*Id.*]. The next day, the 470 number pinged in Indianapolis, Indiana and traveled to 3116 Commander Drive in Louisville, Kentucky ("Commander Drive").  [*Id.*].  The 909 number remained in California.  [*Id.*].  The person associated with the 909 number was never prosecuted, but Cooper was the owner of the 470 number.  [DE 433 at 2555].  Evidence gathered by law enforcement suggested that Polk, who resided in Los Angeles, sent shipments of heroin and cocaine to Ronald Williams ("Williams") in Louisville.  [*Id.* at 2553].  Polk's girlfriend, Ebony Burrus ("Burrus"), leased vehicles and rented hotel rooms in Louisville for Polk and collected debts on Polk's narcotics sales.  [*Id.*].

Law enforcement also believed that Polk maintained a "stash" location at Commander Drive. [*Id.*]. In January 2015, agents intercepted calls between Polk and an unidentified person named Bro Bro who was assisting in Polk's drug trafficking operation. [*Id.* at 2554]. Polk told Bro Bro that he planned to stash his vehicle. [*Id.* at 2555]. Law enforcement observed Polk arriving at Commander Drive and parking a Ford Expedition in the detached garage. [*Id.*]. Agents never intercepted a call between Cooper and Polk. [*Id.*]. Cooper was never identified as Bro Bro—instead, witnesses testified that he went by the name "Kong." [DE 395 at 2011, 2052].

On April 2, 2015, law enforcement observed what they believed to be a drug delivery between Cooper and Williams. Photos showed Cooper's rental car— a 2013 black Toyota Corolla, as shown by Avis Rental Car records at trial [DE 396 at 2273–75]—leaving Commander Drive and arriving at Williams' apartment at 4551 S 2nd Street. [DE 455 at 2629]. The photos showed Williams receiving a duffle bag from the trunk of the car. [DE 395 at 1870–71]. Police claimed they found this same bag during a traffic stop the next day, after observing Williams place it in a Ford Taurus. [*Id.*]. The photos did not show the identity of the driver in Cooper's rental car. [DE 444 at 2603–04]. Cooper maintained someone else was driving the car at the time in question on April 2, and that he was elsewhere during the transaction. [DE 433 at 2559].

On April 3, 2015, law enforcement executed a search warrant on Commander Drive. [DE 433 at 2556]. Cooper opened the door for law enforcement and informed officers that he was visiting from California to relax and spend time with his sister. [*Id.*]. Cooper stated that he owned the residence and rented the garage space to a man named "Jerry" who used it to store an older model Ford Expedition. [*Id.*]. This vehicle was suspected (and later confirmed) to have a hidden compartment and being used in Polk's drug trafficking operation. [*Id.*; DE 396 at 2315]. While searching the residence, law enforcement found a safe inside a closet, which was locked with a

deadbolt.  [DE 433 at 2556].  Inside the safe, officers found $276,000 in cash and what was believed to be a drug ledger.  [*Id.* at 2556–57].  When asked about the contents of the safe, Cooper asserted that it contained his life savings.  [*Id.*].  He claimed that he worked in the entertainment industry and earned the money managing music acts at smaller venues by collecting cash at the door.  [*Id.* at 2559].  Cooper asserted that he was holding the money to pay off an outstanding tax debt.  [*Id.*].

While searching the residence, law enforcement also found a digital money counter, a paper shredder, black duct tape, saran wrap, axle grease, and a FoodSaver for vacuum sealing.  [*Id.* at 2557; DE 395 at 1963].  Agents found two pistols in the residence.  [DE 433 at 2557].  Cooper asserted that another individual, Damani Hashim ("Hashim"), would often travel with him to Louisville and stay at the residence.  [*Id.*].  The United States conceded that it is likely the second pistol belonged to Hashim.  [*Id.*].  A search of the Ford Expedition, which was registered to Burrus, revealed a hidden compartment behind the dash of the vehicle.  [*Id.*].  Law enforcement did not find drugs at Commander Drive.  [*Id.*].

### B.  The Trial

Cooper was charged with three counts: (1) conspiracy to possess and distribute heroin, (2) possession with intent to distribute heroin, and (3) possession of a firearm in furtherance of a drug trafficking crime.  [DE 256].  At trial, the United States presented evidence that they allege proved Cooper delivered heroin to Williams on April 2, 2015—one day before police searched the residence at Commander Drive.  [DE 455 at 2629].  The evidence consisted of pole camera photos, testimony from Cooper's co-defendants, and testimony from law enforcement officers.

First, photos from pole cameras showed Cooper's rental car leaving Commander Drive and meeting Williams at 4551 S 2nd Street ("2nd Street").  [DE 455 at 2629].  The photos revealed

4

that Williams briefly interacted with the vehicle before it drove away—only 16 seconds, according to a witness at trial.  [*Id.*; DE 395 at 1870].  That said, the photos from the pole cameras did not show Cooper driving the vehicle or delivering heroin to Williams.  [DE 455 at 2603–604].  Police found Cooper's black Corolla rental car and the Ford Expedition with the hidden compartment in the detached garage behind Commander Drive during the execution of the search warrant on April 3, 2015.  [DE 395 at 1957].

Second, testimony from multiple co-defendants connected Cooper to the drug deal and the drug trafficking organization.  Williams testified that Cooper delivered the heroin and testimony from Burress and Polk identified Cooper as a member of the conspiracy.  [DE 444 at 2603].  Burress explained that she knew Cooper as "Kong" and that she saw him most of the times she visited Commander Drive, including counting money with Polk.  [DE 394 at 2012–14].  She also said that Polk described Commander Drive as Bro Bro's house, and that Bro Bro was not any one person in particular.  [*Id.* at 2013].  Williams also said he knew Cooper as "Kong" and that he had been present at a meeting between Polk, Williams, and Cooper in California that planned the drug delivery at the 2nd Street location.  [DE 395 at 2052, 2055].  Williams testified that Cooper drove the black Corolla to deliver the heroin to him, and that he delivered this same heroin in the same duffle bag to the Ford Taurus that was later seized by police.  [*Id.* at 2058–59].  Polk testified about Cooper's role in the organization operating a safe house at Commander Drive and providing the Ford Expedition used to transport drugs.  [DE 396 at 2136–37, 2139].  Polk also explained how all the items discovered in Cooper's home were used in furtherance of the drug trafficking organization and explained how the drug delivery from Cooper to Williams was discussed at a meeting in California weeks earlier.  [DE 396 at 2162–67, 2170].

Third, law enforcement officers testified about Cooper's involvement, including Detective Danny Evans ("Evans"), DEA Special Agent Brian Sanders ("Sanders"), and DEA Special Agent Jason Moore ("Moore"). Evans was the "police department's representative" for this investigation. [DE 395 at 1834]. Evans testified that Cooper's vehicle left Commander Drive at 1:44 p.m. and arrived at Williams' address 13 minutes later at 1:57 p.m. [DE 395 at 1866–69]. He explained that the delivery lasted approximately 16 seconds, [*Id.* at 1870], and the vehicle returned to Commander Drive at approximately 3:02 p.m. [*Id.* at 1866]. This testimony was based on an analysis of the pole camera footage. [*Id.*]. Evans testified that Google Maps showed a drive time of 12 minutes between the Commander Drive and 2nd Street locations, but that it took him 10 minutes to drive. [DE 395 at 1853–54]. He elaborated that in his experience the drive typically took between 10 and 15 minutes, depending on traffic. [*Id.* at 1853]. During cross-examination of Evans, Cooper questioned him about the ability to track Cooper's phone pings, which Evans confirmed were available in this case. [*Id.* at 1890]. Sanders was a "co-lead" on this investigation. [DE 395 at 1924]. Sanders' testimony walked through the execution of the search warrant at Commander Drive and what was found inside the residence. [DE 395 at 1940–71]. Moore explained the significance of cell phone records, airline travel records, and rental car records introduced into evidence by the United States. [DE 396 at 2266–75]. Moore also gave his opinion that many items found within the Commander Drive house were commonly used in drug trafficking. [*Id.* at 2280–90]. On cross-examination, while Moore asserted that the items found at Commander Drive were indicative of drug trafficking, he acknowledged that certain items he might expect to find were missing such as scales and heroin residue on equipment. [*Id.* at 2306–07].

The United States did not present any intercepted phone calls implicating Cooper in the drug trafficking activity, despite intercepting phone calls for months between Polk and several individuals, including Williams, Burrus, Gary Ross, and Larry Coward. [DE 395 at 1886]. Cooper claims that another individual borrowed his rental car during the time in question on April 2, 2015, and that he was nowhere near the alleged drug transaction. [DE 433 at 2559]. While the United States did not present evidence of drugs found at Commander Drive, they did find drugs in the duffle bag placed in a Ford Taurus by Williams at the 2nd Street location shortly after searching Commander Drive. [DE 395 at 1854–55].

The jury found Cooper guilty on all three counts, and Cooper was sentenced to 180 months of imprisonment followed by five years of supervised release. [DE 384]. After Cooper's conviction, Cooper filed several motions to compel the United States to turn over evidence, including all location tracking data for the 470 phone number. [DE 344; DE 345; DE 346; DE 350]. Eventually, the United States voluntarily turned over the information. [DE 362]. Cooper was eventually allowed to view the cellular ping data in person at the DEA office after multiple attempts to obtain it. [DE 433 at 2560; DE 467 at 2699–2700]. The location data included the location of Cooper's phone around the time of the alleged April 2, 2015 delivery of heroin to Williams. [DE 433 at 2563].

### C.  The Cell Phone Ping Data

Initially, the Court found that the location data provided post-trial for April 2, 2015 showed that Cooper's phone left Commander Drive at 1:17 p.m., and traveled between 8800 Park Laureate Drive, 1892 Princeton Drive, and back to Commander Drive during the relevant time period. [DE 433 at 2563]. This understanding of the data led the Court to believe that the ping data showed Cooper 6.5 to 7.5 miles away from Williams' 2nd Street apartment—the location of the drug deal.

[*Id.*].  In both its response and its supplemental response to Cooper's motion for a new trial, the United States never once challenged this understanding of the data, instead arguing that the data was not exculpatory or material evidence.  [DE 438 at 2573, 2579–82; DE 455 at 2632].

Now, the United States has informed the Court, for the first time, that the ping data was "expressed in Central Time, not Eastern Time."  [DE 463 at 2668].  The email screenshots attached to Special Agent Robertson's ("Robertson") affidavit reveal this time discrepancy—the timestamp on the email account receiving the ping is always an hour ahead of the timestamp for the ping itself.  [*See* DE 463-1 at 2685].  That is because Sprint—the cell phone carrier providing the ping data—was headquartered in Overland Park, Kansas in the Central Time Zone.  [*Id.* at 2683].  Bearing that in mind, the ping data tells a different narrative for the relevant period.  In Eastern Time, Cooper's phone pinged near Commander Drive at 1:42 p.m.  [*Id.* at 2686].  At 1:59 p.m., a cached ping appears, meaning "the whereabouts of the phone are unknown."[1]  [*Id.* at 2685].  The next two pings are near Park Laureate Drive at 2:17 p.m. and 2:35 p.m.  [*Id.* at 2686].  Finally, the next two pings are near Commander Drive again at 2:52 p.m. and 3:10 p.m., [*Id.*], where the phone remains for the rest of the day according to Robertson's evidentiary hearing testimony.  The pings never show Cooper near the 2nd Street location, but there is a significant portion of time—between 1:42 p.m. and 2:17 p.m.—when the phone's whereabouts are unaccounted for due to the cached ping.  That ping, which coincided almost exactly with the time of the drug delivery, was the only

---

[1] Robertson explained what a "cached" result meant in detail:

> A ping with a cached result meant that the network was unable to get a location fix and likely used a historical reading to estimate the phone's location. A cached record often reflected the phone's last known location; it was not the phone's location at the time the record was sent. This could be because the phone was off or off-network; the phone could not be seen by the network at the time of the ping. The location provided, if any, was the network's best guess.

[DE 463-1 at 2684].  At the evidentiary hearing, Robertson gave her opinion that in a suburban area such as Louisville, the most likely explanation for the cached ping was that the phone was intentionally turned off.

cached ping from the phone on April 2, 2015.  None of the pings affirmatively place Cooper near the 2nd Street location.

At the evidentiary hearing, Moore testified that it was not until the summer of 2023—after the Court granted a new trial following five separate filings from the parties—that the United States even realized that a time difference in the data existed.  Moore acknowledged that ping data is a type of electronic surveillance and that he would have turned it over if a proper request was made.  Moore also agreed with Cooper that the data was in a format at the time of trial and at the time of Cooper's requests that could have placed a pin on a map, similar to Robertson's affidavit.  Moore acknowledged that a user would get a pin within seconds of clicking on the link from Sprint in the emails, but that he did not remember whether he turned over the ping data to the United States Attorney's Office.  Indeed, from the evidence adduced at the evidentiary hearing, it does not appear that even the United States was aware of the time zone difference until they moved to reconsider.  Cooper reiterated at the hearing that while he was generally made aware of location tracking, he was never made aware that the pings were in a decipherable format or being sent in emails every fifteen minutes.

Before trial, Cooper requested that the United States "provide and/or permit the inspection and copying of the Rule 16 discovery and *Brady* materials."  [DE 456 at 2638 (italics added)].  Cooper also requested "detailed disclosure of the circumstances surrounding the use of any electronic surveillance in association with this case."  [*Id.* at 2639].  The United States did not provide Cooper, or any other defendants, with the underlying ping data.  [DE 455 at 2628].  But the United States did provide Cooper with a report indicating that his phone was subject to geo-locating.  [DE 455-1].  Cooper concedes that he was aware the United States had geo-location data but was unaware that the Government possessed data for April 2, 2015.  [DE 456 at 2641–42].

When asked about the period during which law enforcement was tracking Cooper, Special Agent Sanders testified that he did not remember the exact dates, but February and March seemed accurate.  [DE 395 at 1980].

Sanders also testified that the government had location data for the 909 number on April 2, which Cooper requested at trial.[2]  [*Id.* at 2001].  This request was later withdrawn because the United States stated that the location data was indecipherable because it was in its raw form.  [DE 396 at 2116 ("And they also indicated to me that the ping data they have is raw data.  In other words, it's just going to be just sheets of numbers and things that really, unless they're—they would be indiscernible just looking at them in the format that they have them at this point in time.")].  Yet, in its supplemental brief to the motion for new trial, the United States explained that the ping data was not in its raw form and required no deciphering.  [DE 455 at 2628].  Instead, the phone companies forwarded ping data by email that was generated every 15 minutes.  [*Id.*].  The email contained latitude and longitude along with a radius within which the phone was located.  [*Id.*].  The emails also included a link to Google Maps, which would plot the ping on a map.  [*Id.*].  This understanding was confirmed by Special Agent Robertson's affidavit [DE 463-1 at 2684] and evidentiary hearing testimony.

Following the post-trial discovery of ping data that seemingly indicated Cooper was not present at the April 2 heroin delivery, Cooper moved for a new trial.  [DE 433].  After reviewing the parties' briefs, the Court requested additional briefing and included six questions for the parties to answer.  [DE 452].  The United States [DE 455] and Cooper [DE 456] both submitted supplemental briefs addressing the Court's questions.  After reviewing the record and the parties'

---

[2] It is likely that Cooper's counsel was seeking the number connected to Cooper, because the request followed a discussion of the person utilizing Commander Drive.  [DE 395 at 2000–01].

post-trial briefs, the Court granted Cooper's motion for a new trial.  [DE 460].  The United States now asks the Court to reconsider that decision.  [DE 463].

## II.      Standard for Reconsideration

Because the Federal Rules of Criminal Procedure do not expressly provide for motions to reconsider, courts "rely on 'analogous precedent arising under the Federal Rules of Civil Procedure.'"  *United States v. Johnson*, No. 20-5873, 2022 WL 35406, at \*5 (6th Cir. Jan. 3, 2022) (quoting *United States v. LaDeau*, 734 F.3d 561, 572 n.3 (6th Cir. 2013)).  Accordingly, "a motion for reconsideration may be granted when there has been '(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice.'"  *Id.* (quoting *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005)).  The United States argues that the Court's grant of a new trial for a *Brady* violation was both a "clear error of law" and a "manifest injustice" because it was based on a mistaken factual understanding. [DE 463 at 2678].  To evaluate those claims, the Court reviews the standards it applied in granting a new trial and finding a *Brady* violation had occurred.

### A.  New Trial Standard

The Court granted a new trial under Federal Rule of Criminal Procedure 33, which provides that "[u]pon the defendant's motion, [a district] court may vacate any judgment and grant a new trial if the interest of justice so requires."  *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (quoting Fed. R. Crim. P. 33(a)).  Rule 33's "interest of justice" standard allows the grant of a new trial where substantial legal error has occurred.  *United States v. Whittle*, 223 F. Supp. 3d 671, 675 (W.D. Ky. 2016), *aff'd*, 713 F. App'x 457 (6th Cir. 2017) (citing *Munoz*, 605 F.3d at 373).  The court may grant a new trial on one of two grounds: (1) newly discovered evidence under Rule 33(b)(1); or (2) a motion "grounded on any reason other than newly discovered evidence"

under Rule 33(b)(2).  The burden is on the defendant to justify a new trial.  *United States v. Carson*, 560 F.3d 566, 585 (6th Cir. 2009).  "The decision to grant or deny a motion for a new trial is entirely within the discretion of the district court, and [the Sixth Circuit] will not reverse absent a showing of an abuse of discretion."  *United States v. Anderson*, 76 F.3d 685, 692 (6th Cir. 1996); *see also United States v. Farrad*, 895 F.3d 859, 885 (6th Cir. 2018); *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015).  "[S]uch motions should be granted sparingly and with caution." *United States v. Turner*, 995 F.2d 1357, 1364 (6th Cir. 1993); *see also United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007) (Rule 33 motions "are granted only in the extraordinary circumstance where the evidence preponderates heavily against the verdict." (citation and quotation omitted)).

## B. *Brady* Standard

The Court based its grant of a new trial on a *Brady* violation, which it held was a substantial legal error.  [DE 460 at 2660–61].  The Court will apply the same standard here, considering new information regarding the ping data it relied on, to determine whether a new trial is still appropriate. "In order to establish a *Brady* claim [Cooper] must show that: (1) evidence was suppressed by the prosecution in that it was not known to [Cooper] and not available from another source; (2) the evidence was favorable or exculpatory; and (3) the evidence was material to the question of [Cooper's] guilt."  *United States v. Faller*, No. 1:13CR-00029-JHM, 2014 WL 12691595, at *4 (W.D. Ky. May 29, 2014) (citing *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000); *Luton v. Grandison*, 44 F.3d 626, 628-29 (8th Cir. 1994); *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *Moore v. Illinois*, 409 U.S. 786, 794–95 (1972)).  "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."  *Jalowiec v. Bradshaw*, 657 F.3d 293, 305 (6th Cir.

2011) (quoting *Cone v. Bell*, 556 U.S. 449, 469–70 (2009)).  If the allegedly suppressed evidence is "merely cumulative to evidence presented at trial, then it is immaterial under *Brady*."  *United States v. Bailey*, No. 19-2280, 2022 WL 2444930, at *11 (6th Cir. July 5, 2022) (internal quotation marks and citations omitted).

### III.    Discussion

The United States argues in its motion that Cooper's interpretation of the cellular ping data—which the Court relied on when granting his motion for a new trial—was mistaken because (1) it was expressed in Central Time, not Eastern Time and (2) it does not account for the geographic error radius.  [DE 436 at 2668].  Cooper maintains that the ping data places him 6.5 to 7 miles away from the location of the drug delivery; therefore, it is still material.[3]  [DE 467 at 2702].

### A.  Suppression of the Ping Data

Although the nature of the ping data is different than the Court was led to believe when it granted a new trial, the analysis of the first *Brady* element is the same.  The Court again finds that "Cooper's ping data for April 2, 2015, was suppressed by the United States" because "[t]he government was undoubtedly in possession of the ping data."  [DE 460 at 2658 (citing *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) and *United States v. Faller*, No. 1:13CR-00029-JHM, 2014 WL 12691595, at *4 (W.D. Ky. May 29, 2014))].  Cooper requested any electronic surveillance conducted of his client before trial, admittedly unaware of whether any existed at the time.  [DE 467 at 2693].  Cooper also requested ping data at trial (albeit, for the 909 number not associated

---

[3] Cooper also argues that "issues raised for the first time in a motion to reconsider are considered waived." [DE 467 at 2715 (citing *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010))].  *Sanborn* holds only that "arguments made to us for the first time *in a reply brief* are waived," not a motion for reconsideration.  629 F.3d at 579 (citation omitted) (emphasis added).  Regardless, the basis for the United States' motion is not raising a new issue so much as it is correcting a mistake.

with Cooper) and was not provided it.  [*Id.* at 2694].  Even though Cooper said the wrong phone number, the context of the exchange with Sanders should have made it clear to the United States what data Cooper sought.  Still, the United States misrepresented that the data was not in a decipherable format.  [*Id.* at 2695].  As Robertson's affidavit and testimony at the evidentiary hearing makes clear, the data was certainly in a decipherable format.  [DE 463-1 at 2684].  Sprint, Cooper's cell phone provider, sent plotted points on a map at fifteen-minute intervals to law enforcement via email.  [*Id.*].  That is a far cry from "meaningless data that I would have no way of making any determinations on," as Cooper's counsel was allowed to believe at trial.  [DE 467 at 2695].  Furthermore, in its motion for reconsideration and its reply, the United States does not even contest this element of *Brady*.  Accordingly, the Court sees no reason to alter its original finding here—the United States suppressed the cellular ping data, and the first *Brady* element is satisfied.

### B.  Favorability or Exculpatory Nature of the Ping Data

Given that the Court's initial understanding of the data was based on data expressed in Central Time, not Eastern Time, the need for the Court to assess its favorability anew is obvious. When granting a new trial based on the data expressed in Central Time, the Court found it "indisputable" that the ping data was exculpatory.  [DE 460 at 2659].  But expressed in Eastern Time, its favorability to Cooper is less clear.  *See LaMar v. Houk*, 798 F.3d 405, 415 (6th Cir. 2015) ("Evidence is favorable if either exculpatory or impeaching[.]") (citation omitted).

Cooper is correct that the ping data never affirmatively places him near the 2nd Street location, but to suggest that the ping data still places him 6.5 to 7 miles away from the drug delivery goes too far.  [DE 467 at 2702].  During the precise time of the drug delivery at 1:57 p.m., the ping data does not affirmatively place Cooper *anywhere*.  Instead, the cached ping at 1:59 p.m. defaults

to his last known location near Commander Drive at 1:42 p.m.  This leaves a period between 1:42 p.m. until 2:17 p.m. where there is no ping to reveal the location of the phone.  There are numerous possibilities about where the phone could have been located when the 1:59 p.m. ping was cached, but one of those possibilities remains the 2nd Street location.  Evans testified at trial that it took between 10 and 15 minutes to drive from Commander Drive to 2nd Street.  He also testified that the black Corolla left Commander Drive at 1:44 p.m. and arrived at 2nd Street at 1:57 p.m., as shown by pole cameras.  The ping data does not contradict that narrative.  Even though no ping affirmatively places Cooper at the 2nd Street location, the pings do not tell a story that forecloses the possibility of Cooper leaving Commander Drive, dropping the drugs off with Williams at 2nd Street, and then arriving at the location of the next ping by 2:17 p.m.

While the Court disagrees with Cooper that the ping data placed him elsewhere during the drug delivery, Cooper may have used this evidence at trial to point to the *absence* of any pings affirmatively placing him there.  Cooper employed a similar strategy with other evidence, pointing out that no phone calls were ever intercepted between Cooper and Polk and that no drugs or traces of drugs were ever found during the search of Commander Drive.  In that sense, the ping data could be seen as somewhat exculpatory for Cooper, so the Court moves on to address materiality.

### C.  Materiality of the Ping Data

Even if the ping data is somewhat favorable to Cooper, that does not make it "material" to Cooper's guilt.  *See*, *e.g.*, *Hughbanks v. Hudson*, 2 F.4th 527, 542 (6th Cir. 2021) ("[T]he suppressed, favorable evidence does not present a significant challenge to the prosecution's theory of the case or lead to a reasonable probability [of a different result] [.]").  A defendant demonstrates *Brady* materiality "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Kyles*, 514 U.S. at

435.  In this case, the cellular ping data does not rise to that level.  At most, the cellular ping data could only have been used by Cooper to show the absence of any pings affirmatively placing him at 2nd Street during the drug delivery.  This would not significantly undercut the United States' case given that pole cameras showed Cooper's rental car leaving Commander Drive and arriving at 2nd Street for the drug delivery; multiple co-defendants testified about Cooper's participation in the conspiracy; Williams testified that Cooper was driving the black Corolla during the drug delivery; and law enforcement officers testified that materials found in Cooper's home along with hundreds of thousands of dollars in cash and a firearm—all of which Cooper admitted were his—were indicative of drug trafficking.  Considered in this context, the ping data is not "material in the sense that its suppression undermines confidence in the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 678 (1985).

The Court finds no reasonable probability that the jury would have seen any of the three charges in a different light with the benefit of the cellular ping data.  The jury already heard evidence that Cooper was never once intercepted in a phone call with Polk and that no drugs were ever found on Cooper or at Commander Drive.  There is no reason to believe that the absence of ping data placing him at 2nd Street would have altered the jury's assessment, especially considering that the United States could have had a witness explain the cached ping as Robertson explained to the Court at the evidentiary hearing.  *See Hughbanks*, 2 F.4th at 542 ("the suppressed evidence falls short of mounting a plausible counter-narrative" where "key parts of the suppressed evidence support the [prosecution's] theory rather than undermine it" and it had a "relatively weak exculpatory nature").  The jury would have heard that the most likely explanation for a cached ping in suburban Louisville was that the phone was turned off, which just as easily could have *supported* the United States' case.  The rest of the data aligned with the United States' theory.

16

Because the cellular ping data does not create a "reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different," *Jalowiec*, 657 F.3d at 305, there was no substantial legal error, therefore there was no *Brady* violation. With no *Brady* violation, there is no "extraordinary circumstance where the evidence preponderates heavily against the verdict" that would warrant a new trial. *Hughes*, 505 F.3d at 593.

## IV.    Conclusion

While the Court finds upon reconsideration that the ping data does not rise to the level of materiality required for a *Brady* violation—a finding that requires correcting its own grant of a new trial—it does not reach that decision lightly. Put bluntly, even though the non-disclosure of this ping data was not a *Brady* violation, the United States should have turned it over to Cooper. Instead of simply providing the data to Cooper in a readable format—something that could have been done before, during, or after the trial—the United States forced Cooper's counsel to come in person to write down the ping data within a limited timeframe. Even this limited access to the data only occurred after trial. As a result, a misunderstanding developed, and significant resources were spent by the Court, the United States Marshals Service, and Cooper's counsel in post-conviction proceedings. In addition to extra litigation, Cooper had to be transported to Kentucky from across the country by the Bureau of Prisons.

The United States was in the best position to prevent this error. *See United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir. 1988) (explaining that "the government typically is the sole judge of what evidence in its possession is subject to disclosure" under *Brady* and "it acts at its own peril" if it does not adequately comply). Cooper had no way of knowing that the data was expressed in a different time zone, and it was incumbent upon the United States to correct this error immediately. Despite that, in none of its briefing or supplemental briefing prior to the Court

granting a new trial did the United States ever mention that the data was off by an hour.  Had the Court been made aware of this, it would not have granted a new trial in the first place, and significant time and effort could have been saved by all involved.  More importantly, the interests of justice are best served when prosecutors err on the side of disclosure.  *See United States v. Agurs*, 427 U.S. 97, 108 (1976) ("[T]he prudent prosecutor will resolve doubtful questions in favor of disclosure"); *Kyles*, 514 U.S. at 439  ("Such disclosure will serve to justify trust in the prosecutor as 'the representative . . . of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done.'") (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).

It is regrettable that Cooper received the false hope of a new trial before the matter was resolved with the correct information.  The Court is sympathetic to Cooper's frustration with the United States' reluctance to turn over this data and failure to timely correct the time zone error, but under the *Brady* standard, it is both true that the prosecutor has a "broad duty of disclosure" and that "not every violation of that duty necessarily establishes that the outcome was unjust." *Strickler*, 527 U.S. at 281.  Such is the case here.

For the reasons explained, and the Court being otherwise sufficiently advised, the United States motion to reconsider is **GRANTED**.

January 12, 2024

Rebecca Grady Jennings, District Judge
United States District Court

cc: counsel of record